United States District Court
Southern District of Texas

**ENTERED**

July 26, 2019

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MICROCAPITAL FUND LP, MICROCAPITAL FUND LTD., AND MICROCAPITAL LLC, | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | No. 4:18-CV-1020 |
| CONN'S INC., THEODORE M. WRIGHT, BRIAN TAYLOR, and MICHAEL J. POPPE, | § § § § | |
| *Defendants.* | § § | |

## REPORT AND RECOMMENDATION

Plaintiffs MicroCapital Fund LP, MicroCapital Fund Ltd., and MicroCapital LLC (collectively "Plaintiffs" or "MicroCapital") filed this action for violations of federal securities laws, common law fraud, and negligent misrepresentation against Defendants Conn's, Inc. ("Conn's" or "Corporation"), Theodore Wright, Brian Taylor, and Michael Poppe (collectively "Defendants"). Pls.' Compl., ECF No. 3. Before the Court is Defendants' motion to dismiss.[1] ECF No. 39. Having considered the record and authorities, the Court recommends that Defendants' motion to

---

[1] Plaintiffs filed an opposition. ECF No. 47. Defendants filed a reply. ECF No. 49. Both parties also filed supplemental briefs, ECF Nos. 55, 57, pursuant to the Court's order, ECF No. 52. Plaintiffs also filed a motion for leave to file a chart of false and misleading statements in support of their opposition to Defendants' motion to dismiss. ECF No. 42. Although Plaintiff represented that the motion was opposed, Defendants did not file a response and the time to do so expired. The Court granted Plaintiff's motion. Order, ECF No. 63.

dismiss, ECF No. 39, should be granted in part and denied in part.[2]

# I.
# BACKGROUND

## A. The Parties.

This case shares a common factual background with a settled securities fraud class action (the "Class Action")[3] and a shareholder derivative suit against Conn's,[4] which sells household appliances in retail stores across the country and also has a credit arm of its business, providing in-house credit options, third-party financing programs, and third-party rent-to-own payment plans to its customers. ECF No. 3 at ¶¶ 3, 30, 43. The MicroCapital Plaintiffs were previously class members in the Class Action but opted out of the Class Action settlement and filed the instant lawsuit. *See* Letter, *In re Conn's*, No. 14-CV-548 (S.D. Tex. Sept. 20, 2018), ECF No. 189.

Beginning in February 2014, Conn's made public announcements that its Fourth Quarter Fiscal Year ("FY") 2014 bad debts in its credit segment exceeded its previously issued FY 2014 guidance and it expected earnings per share dilution in the Fourth Quarter in 2014 and in 2015. ECF No. 3 at ¶¶ 181-82. Plaintiffs allege

---

[2] The District Judge referred this case for all pretrial purposes pursuant to 28 U.S.C. § 636. ECF Nos. 50, 61. Pursuant to 28 U.S.C. 636(b)(1)(B), a motion to dismiss is a dispositive motion appropriate for a Report and Recommendation. Plaintiffs' motion is not a dispositive motion and is appropriate for an Order.

[3] *Compare* ECF No. 3 *with* Fourth Am. Compl., *In re Conn's, Inc. Sec. Litig.*, No. 14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104.

[4] *See* Compl., *Hack v. Wright et al.*, No. 4:14-CV-3442 (S.D. Tex. Dec. 1, 2014), ECF No. 1.

that Defendants engaged in wrongdoing between April 3, 2013 and February 20, 2014 (the "Relevant Period"). *Id*. at ¶ 2. Plaintiffs purchased Conn's stock during the Relevant Period. *Id*. at ¶¶ 27-29. Plaintiffs bring this case against Conn's and three Individual Defendants who are former Conn's executives: Wright, Conn's Chief Executive Officer ("CEO"); Taylor, Conn's Chief Financial Officer ("CFO"); and Poppe, Conn's Chief Operating Officer ("COO"). *Id*. at ¶¶ 31, 33, 35. The complaint alleges they each held these positions during the Relevant Period and have since left Conn's. *Id*.

### B. Plaintiffs' Complaint.

In their 103-page complaint, Plaintiffs allege that Conn's lowered its underwriting standards and offered credit to riskier customers—including those with zero credit scores and very little verification—as a strategy to generate revenue. *Id*. at ¶¶ 4, 42, 46, 49, 53-56, 58, 62, 161. Plaintiffs allege this led to financial problems including increases in delinquencies, of which the Defendants were aware. *Id*. at ¶¶ 66, 84, 132, 134. Plaintiffs allege that Defendants made false and misleading public statements (including press releases, annual and quarterly financial reports, statements during conference calls and conferences, and statements to analysts) that misrepresented the extent of the underwriting policy changes, overstated Conn's financial condition, and falsely attributed the financial problems to reasons other than the lower underwriting standards, thereby violating their fiduciary duties and

3

federal securities laws. *Id*. at ¶¶ 88-130.

Plaintiffs also allege that the false and misleading information presented to the public artificially inflated Conn's stock prices during the Relevant Period. *Id*. at ¶¶ 117, 141, 214, 215. Plaintiffs allege that they paid artificially inflated prices for Conn's securities and suffered damages as a result. *Id*. at ¶¶ 27-29, 89, 243. Plaintiffs bring claims for (1) securities fraud in violation of section 10(b) of the Securities Exchange Act ("SEA") and Securities and Exchange Commission ("SEC") Rule 10b-5, (2) control person liability under section 20(a) of the SEA, (3) insider trading in violation of section 20A of the SEA, (4) Texas common law fraud, (5) Texas common law negligent misrepresentation, (6) Connecticut common law fraud, and (7) Connecticut common law negligent misrepresentation. *Id*. at ¶¶ 230-78.

### C. Defendants' Motion to Dismiss.

Defendants seek to dismiss each of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for the following reasons:

1. Plaintiffs' securities fraud claim because Plaintiffs failed to plead material misstatements or scienter with the particularity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b);

2. Plaintiffs' 20(a) control person liability claim because Plaintiffs failed to plead a viable underlying securities fraud claim;

3. Plaintiffs' 20A insider trading claim because Plaintiffs failed to plead an underlying securities fraud claim and their purchases were not "contemporaneous" with the Individual Defendants' stock sales; and

4.  Plaintiffs' state law claims because they are duplicative.

ECF No. 39 at 7.

## II.
## LEGAL STANDARD UNDER RULE 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

The complaint must include more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted). A complaint must "contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the pleaded factual contents allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when

assumed to be true 'raise a right to relief above the speculative level.'" *Culliver v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

The ultimate question "is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff." *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 590 (S.D. Tex. 2012). "[I]n considering a motion to dismiss under Rule 12(b)(6), a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true." *Duke Energy Int'l*, 748 F. Supp. at 665. "[C]ourts are required to dismiss, pursuant to [Rule 12(b)(6)], claims based on invalid legal theories, even though they may be otherwise well-pleaded." *Farshchi v. Wells Fargo Bank, N.A.*, No. H-15-1692, 2016 WL 2858903, at *2 (S.D. Tex. May 13, 2016) (citing *Flynn v. State Farm Fire and Cas. Ins. Co.*, 605 F. Supp. 2d 811, 820 (W.D. Tex. 2009)).

### III.
### SECURITIES FRAUD UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND SECURITIES AND EXCHANGE COMMISSION RULE 10b-5

#### A. Legal Standard For Securities Fraud.

Under section 10(b) of the SEA,

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange … [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate….

15 U.S.C. § 78j(b). "SEC Rule 10b-5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *In re BP P.L.C. Sec. Litig.*, No. 4:12-CV-1256, 2013 U.S. Dist. LEXIS 171459, at *47 (S.D. Tex. Dec. 5, 2013) (quoting 17 C.F.R. § 240.10b-5(b)) (Ellison, J.).

> To state a claim under section 10(b), the plaintiff must allege:
>
> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss.[5]

*Id*. at *48 (citing *Lormand*, 565 F.3d at 238-39).

### 1.  Material misrepresentations and omissions.

"Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b)." *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) (citations omitted) (Ellison, J.). Not only does Rule 9(b) require fraud to be pleaded with particularity, but the PSLRA enhances the requirements of Rule 9(b). To meet the pleading requirements of the PSLRA, a

---

[5] Defendants only allege that the first two elements are not adequately pleaded. ECF No. 39 at 7.

plaintiff must

> (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Id.* (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

"To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material." *In re BP*, 2013 U.S. Dist. LEXIS 171459, at *49. A misrepresentation or omission "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). "Fraud based on an omission must sufficiently allege a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 457 (S.D. Tex. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)) (internal quotation marks omitted).

### 2. Scienter.

"In the context of federal securities fraud, scienter is defined as an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that

the defendant must have been aware of it." *In re BP*, 843 F. Supp. 2d at 748 (citation

and quotation marks omitted).

> Severe recklessness is "limited to those highly unreasonable omissions or
> misrepresentations that involve not merely simple or even inexcusable
> negligence, but an extreme departure from the standards of ordinary care, and
> that present a danger of misleading buyers or sellers which is either known to
> the defendant or is so obvious that the defendant must have been aware of it."

*Id*. at 748-49 (citation omitted). "Section 10(b) and Rule 10b-5 do not protect

investors against negligence or corporate mismanagement." *Id.* at 748 (citation

omitted).

"[T]he court may not construe allegations contained in the Complaint against

the defendants as a group as properly imputable to any particular individual

defendant unless the connection between the individual defendant and the allegedly

fraudulent statement is specifically pleaded." *In re BP*, 2013 U.S. Dist. LEXIS

171459, at *52 (citation and quotation marks omitted). The court must look to the

"state of mind of the individual corporate official or officials who make or issue the

statement…." *Id*. at *52 (citation and quotation marks omitted).

The Supreme Court "outlined a three step approach to reviewing scienter

allegations in a motion to dismiss a federal securities fraud case pursuant to the

PSLRA." *In re BP*, 843 F. Supp. 2d at 748 (citing *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 323 (2007)).

> First, the allegations must, as in federal pleadings generally, be taken as true.
> Second, courts may consider documents incorporated into the complaint by

reference and matters subject to judicial notice.[6] The facts must be evaluated
collectively, not in isolation, to determine whether a strong inference of
scienter has been pleaded. … Third, a court must take into account plausible
inferences opposing as well as supporting a strong inference of scienter. The
inference of scienter must ultimately be "cogent and compelling," not merely
"reasonable" or "permissible."

*Id*. (citations omitted). "A complaint will survive … only if a reasonable person
would deem the inference of scienter cogent and at least as compelling as any
opposing inference one could draw from the facts alleged." *Carlton*, 184 F. Supp.
3d at 459 (quoting *Tellabs*, 551 U.S. at 324). While the court may look to each
individual allegation, the court must still "follow this initial step with a holistic look
at all the scienter allegations." *Id*. (citation omitted).

"[T]he strong-inference pleading standard does not license us to resolve
disputed facts at this stage of the case." *Cent. Laborers' Pension Fund v. Integrated
Elec. Servs. Inc.*, 497 F.3d 546, 551 (5th Cir. 2007) (citation omitted). "It does,
however, permit the court to 'engage in some weighing of the allegations to

---

[6] Both parties attached to their briefing SEC filings, press releases, transcripts of earnings calls and
exhibits from those calls, stock prices, and other documents referred to in the complaint. On a
motion to dismiss, courts may consider documents that are referred to in the complaint and central
to the plaintiff's claims without converting the motion to a motion for summary judgment. *In re
Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 384-85 (S.D. Tex. 2011) (citing *Scanlan v.
Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)) (Ellison, J.), *aff'd*, 464 F. App'x 334 (5th
Cir. 2012); *accord Carlton*, 184 F. Supp. 3d at 451-52 (considering SEC filings, 10-Q and 10-K
forms, and earnings call transcripts attached to the motions to dismiss). In securities fraud cases,
courts may also take judicial notice of documents that are filed with the SEC. *In re Franklin*, 782
F. Supp. 2d at 385; *see also In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979-80
(N.D. Cal. 2010) (taking judicial notice of transcripts of analyst conference calls and PowerPoint
presentations to analysts); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D.
Tex. 2001) (courts may take judicial notice of stock prices and documents of public record).

determine whether the inferences toward scienter are strong or weak.'" *Id.* (citation omitted).

### B. Alleged Misrepresentations And Omissions.

Because the volume of allegedly actionable statements is so large, the Court will not examine each statement individually but will group them as follows for ease of analysis: (1) statements that were upheld in the Class Action, (2) statements that were struck in the Class Action, (3) statements regarding Conn's loosening of underwriting standards, (4) statements regarding the cause of the deterioration of Conn's credit portfolio, (5) statements allegedly protected by the PSLRA's safe harbor, and (6) Conn's financial statements.[7]

#### 1. Statements upheld in the Class Action.

Plaintiffs challenge several statements that were upheld as actionable in the Class Action. *See* ECF No. 3 at ¶¶ 91, 92, 94, 104, 106, 107, 108, 112, 113,[8] 115,

---

[7] The complaint also identifies several statements by analysts. ECF No. 3 at ¶¶ 98, 118, 120, 128, 130. However, Plaintiffs do not appear to allege that these statements are actionable. *See* ECF No. 47-1. Therefore, the Court assumes they were only included in the complaint for context. The District Judge dismissed the analyst statements from the Class Action. *See* Mot. Hr'g Tr. at 49:6-50:2, 74:2-25, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 14, 2015), ECF No. 102.

[8] Only part of the statement in paragraph 113 was addressed and upheld in the Class Action ("[T]hey're still the same type of customers we've always gotten. We're still using the same underwriting tools and practices that we used before."). Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 34:17-40:3, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118; Fourth Am. Compl. at ¶ 100, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Part of the statement in paragraph 113 ("The short answer is no. We don't believe that the increase in the percentage of sales that we're financing had anything to do with the issues that we faced in collections … And so we expect we'll get a similar result. So, no, we don't believe that that's a factor.") was not challenged in the Class Action

and 122;[9] Order, *In re Conn's, Inc.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016),

ECF No. 125 (Ellison, J.); Mot. Hr'g Tr. at 73:1-89:10, 111:14-123:6, *In re Conn's*,

No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (upholding statements in

paragraphs 66, 67, and 96 in the Class Action Fourth Amended Complaint); Mot.

Hr'g Tr. at 3:25-29:20, 31:12-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr.

8, 2016), ECF No. 118 (upholding statements in paragraphs 96, 97, 99, 100, and 111

in the Class Action Fourth Amended Complaint). For the same reasons the District

Judge found these statements actionable (and supported by scienter) in the Class

Action, the Court recommends the same statements be found actionable (and

supported by scienter) here. Defendants' motion as to these statements should be

denied.[10]

---

and should be upheld for reasons addressed *infra* at Section III.B.4. *See* ECF No. 3 at ¶ 113; ECF No. 57-1 at 21.

[9] Part of the statement in paragraph 122 ("…the Company made good progress in addressing the issues we experienced in the second quarter with our credit collection system.") was found actionable in the Class Action and the other part ("We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency should improve markedly over the next quarter.") was struck. Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 40:4-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118; Fourth Am. Compl. at ¶ 111, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104.

[10] Part of the statement challenged in paragraph 90 ("In February we made refinements to our decision process that resulted in declining higher-risk accounts with credit scores above 525 and began underwriting applications with credit scores between 500 and 525.") is nearly identical to part of the statement challenged in paragraph 94, and should be upheld for the same reasons. *Compare* ECF No. 3 at ¶ 90 *with id*. at ¶ 94. Although Defendants argue they did not lower Conn's standard minimum FICO score and scores below 500 were accepted only in new stores temporarily, Plaintiffs alleged that Defendants did not disclose the full extent of how low FICO scores Conn's accepted in new stores. ECF No. 39 at 16; ECF No. 47 at 14; ECF No. 3 at ¶¶ 49,

## 2. Statements struck in the Class Action.

Plaintiffs challenge several statements that were struck in the Class Action. *See* ECF No. 3 at ¶¶ 95, 96, 97, 102, 103, 122,[11] and 124-25; Order, *In re Conn's, Inc.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 89:11-92:12, 98:13-99:17, 102:14-19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking statements in paragraphs 68, 69, 82, and 83 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 40:4-41:1, 41:5-8, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (striking statements in paragraphs 111 and 113 in the Class Action Fourth Amended Complaint).

In the Class Action, the plaintiffs relied almost exclusively on confidential witness ("CW") allegations and the District Judge found those allegations insufficient to support these statements as actionable and therefore dismissed them. Here, Plaintiffs corroborated the same CW allegations with references to Conn's internal documents. Nevertheless, Plaintiffs' substantive arguments as to why the statements are false are similar as in the Class Action and warrant the same disposition. *Compare* ECF No. 57-1 at 7, 8, 13, 14, 28, 30 *with* Mot. Hr'g Tr. at

---

53, 56, 58. To the extent Defendants argue that documents cited in the complaint disprove Plaintiffs' allegations, the Court cannot decide the ultimate falsity or truth of the statements on a motion to dismiss, only whether Plaintiffs pleaded specific facts that, if proved, could form the basis of a securities fraud claim. *Rubinstein v. Collins*, 20 F.3d 160, 173 (5th Cir. 1994).

[11] *See supra*, n.9.

89:11-92:12, 98:13-99:17, 102:14-19, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 *and* Mot. Hr'g Tr. at 40:4-41:1, 41:5-8, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118. Just because here there are more sources stating similar facts, that does not automatically transform those same statements that were held to be non-actionable into actionable ones. *See, e.g.*, *In re BP*, 2013 U.S. Dist. LEXIS 171459, at *76, 78-79, 82 (holding that alleged misstatements which were struck in related Class Action remained non-actionable in subsequent suit where nothing in the complaint "compel[led] a different conclusion"). Defendants' motion as to these statements should be granted.[12]

### 3. Plaintiffs challenge statements concerning Conn's credit underwriting standards.

Plaintiffs challenge the following statements concerning Conn's loosening of credit underwriting standards and its impact on delinquencies. The Court will discuss them seriatim.

- "And I would just emphasize again that that wasn't in place after February 1; and the information that we provided from February onward, it's not a factor at all." ECF No. 3 at ¶ 93 (Wright, Fourth Quarter FY 2013 Earnings Call on Apr. 3, 2013).

The Plaintiffs challenge the statement in paragraph 93 because the lower

---

[12] In paragraphs 102 and 125, Plaintiffs appear to challenge longer sections of the statements here than in the Class Action. *Compare* ECF No. 3 at ¶¶ 102, 125 *with* Fourth Am. Compl. at ¶¶ 83, 113, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Nevertheless, the rest of the statements seem to go along with the ones the District Judge already struck in the Class Action so should be struck as well.

underwriting standards continued beyond February 1, 2013. ECF No. 57-1 at 4-5.

Plaintiffs point to CW-4's allegations that "every customer was approved for credit

during the initial four to five months that a new Conn's store was opened…."

ECF No. 3 at ¶ 42(m). Plaintiffs allege that the lower underwriting standards began

in the Christmas sales season, around November or December 2012, so four to five

months later would be between February and May 2013. *Id*. at ¶¶ 42(j), 56, 134(a);

ECF No. 47 at 11, 13. The District Judge found another similar statement actionable

in the Class Action that Wright made during the same call that lower underwriting

standards applied only "for a brief period of time," when in fact plaintiffs alleged

these lasted for four to five months after new stores opened, crediting the CW

allegations. *See* Mot. Hr'g Tr. at 73:1-80:19, *In re Conn's*, No. 4:14-CV-548 (S.D.

Tex. Apr. 8, 2016), ECF No. 117. This statement should be upheld as actionable for

the same reasons.

- "For certain credit applicants that may have past credit problems or lack … credit history, we use … stricter underwriting criteria. The additional requirements include verification of employment and recent work history, reference checks and minimum down payment levels." *Id*. at ¶ 99 (Conn's, 2013 Form 10-K filed on Apr. 5, 2013).

Plaintiffs allege the statement in paragraph 99 is false and misleading because

Conn's did not use stricter underwriting criteria, and instead lowered underwriting

standards and verification requirements, including for riskier customers.

ECF No. 57-1 at 10. Plaintiffs failed to adequately plead that this statement is false.

While underwriting standards may have been lowered across the board for all applicants and more so for new customers in new stores, that does not necessarily mean there were no verification requirements. While Plaintiffs allege there were "virtually" no checks on riskier new customers in new stores and that verification requirements were significantly *reduced*, ECF No. 3 at ¶¶ 42(l), 49, 53-55, 62, 64, 132(e)-(f), (i), the allegations do not quite go so far as to allege there were *no* additional requirements for such customers in new stores. For example, Plaintiffs' own allegations indicate that Conn's apparently still required at least one reference and a down payment and did not require verification of phone numbers *if* the address was verified by Accurint or the customer's bureau in new stores. *Id*. at ¶¶ 62, 132(e); Pls.' Ex. 4 at 21, ECF No. 47-3. These new customers were not automatically approved through the auto approval algorithm. ECF No. 3 at ¶ 53. Furthermore, the District Judge already struck similar statements in the Class Action referring to "raising" or "tightening" or using "stricter" underwriting standards in part because they were too vague and non-specific to be actionable.[13]

- "[W]e implemented changes in our underwriting process during the quarter. These changes were based on analysis performed over the past year to identify credit attributes that would allow us to enhance our decision model to better identify quality credit customers." *Id*. at ¶ 100 (Poppe, First Quarter FY 2014 Earnings Call on June 6, 2013).

---

[13] *See* Mot. Hr'g Tr. at 94:9-14, 102:20-111:13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117.

Plaintiffs argue the statement in paragraph 100 is false because rather than "enhance" Conn's credit portfolio, Defendants weakened it by lowering underwriting standards and knew that lower underwriting criteria increased risk and delinquencies. ECF No. 57-1 at 12. However, the District Judge already struck a similar statement in the Class Action because the mere fact that Defendants lowered underwriting standards does not necessarily mean that they were not trying to enhance their credit operations.[14] Likewise here, the lowering of underwriting standards is not necessarily inconsistent with having performed an analysis over the past year to identify attributes of quality credit customers.

- When asked about credit metrics and 30-day delinquencies in new stores, Wright responded it "[i]s still very early." *Id.* at ¶ 101 (Wright, First Quarter FY 2014 Earnings Call on June 6, 2013).

Plaintiffs contend the statement in paragraph 101 is false because it was not too early to determine the negative impact of the loosened underwriting standards, and Defendants already knew from trend data that looser underwriting standards were causing increased delinquencies. ECF No. 57-1 at 12-13. Defendants contend Plaintiffs fail to plead with particularity how this statement is false or misleading, particularly because Conn's acknowledged in the same call that it continued to open

---

[14] *See* Mot. Hr'g Tr. at 92:13-23, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking statement in paragraph 74 in the Class Action Fourth Amended Complaint that "[w]e are also focusing on improving the profit contribution of our credit operation by raising our underwriting standards.").

new stores on a rolling basis. ECF No. 55-1 at 20. The Court agrees with Defendants and also holds that the statement is too vague without more context to be actionable.[15] Defendants' motion should be denied as to the statement in paragraph 93 and granted as to the statements in paragraphs 99-101 in the complaint.

### 4. Plaintiffs challenge statements concerning the causes of financial problems in Conn's credit segment.

Plaintiffs challenge statements Wright and Poppe made during Conn's Second Quarter FY 2014 Earnings Call on September 5, 2013, and Wright made during Conn's Third Quarter FY 2014 Earnings Call on December 5, 2013, for falsely attributing the deterioration of Conn's credit portfolio to problems other than its underwriting policies (such as to collections issues and flawed implementation of the new electronic Latitude system) and for falsely claiming Conn's corrected those short-term issues (i.e. the systems issues). ECF No. 3 at ¶¶ 111, 113, 114, 116, 126-27. Plaintiffs contend these statements falsely concealed the true cause of the rising delinquencies—the lower underwriting standards. ECF No. 57-1 at 20-22 (citing ECF No. 3 at ¶¶ 42(d), 61-79, 134, 136-37, 193). Plaintiffs allege Defendants did not correct the problems that were actually causing the increase in delinquencies—credit underwriting—which would have a longer-term impact on delinquencies than

---

[15] Neither party attached the June 6, 2013 earnings call transcript. *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 285 (3d Cir. 2010) (on a motion to dismiss securities fraud action, the parties' failure to attach analyst call transcripts "precludes our full consideration of the context in which the statements were made").

a one-time systems issue. *Id*. at 23 (citing ECF No. 3 at ¶¶ 4, 10, 12, 42, 61, 66-70, 74, 76-77, 87, 134, 159-61).

Defendants contend that Plaintiffs failed to plead with particularity facts that show these statements are false. ECF No. 55-1 at 34, 37, 39-40, 42, 52. Defendants contend that Plaintiffs failed to show that software issues had *no* impact on delinquency, and that some of the documents Plaintiffs rely on in the complaint show that Defendants were trying to investigate the cause of rising delinquencies and there was in fact a systems issue that at least to some extent contributed to collections issues because many customers' phone numbers were lost. *Id*.

These statements should be upheld as actionable. Even if these statements are true in part to the extent that the software issues had *some* impact on rising delinquencies, Plaintiffs alleged facts that the lower underwriting standards were the primary or at least a significant cause of rising delinquencies.[16] ECF No. 3 at ¶¶ 8, 10, 42(d), (k), 66, 68, 69(d). Plaintiffs also pleaded facts that this was evident before the misstatements were made. *Id*. at ¶¶ 10, 42(i), (r), 68, 69(d), 70, 72. In addition,

---

[16] Defendants also contend the statement in paragraph 113 is not actionable because it is forward-looking. ECF No. 55-1 at 37-38. While part of the statement ("And so we expect we'll get a similar result.") is forward-looking, it should be actionable because the statements immediately before and after it are actionable. *See supra*, section III.B.1. To the extent Plaintiffs pleaded that those statements are misleading, the future expectations based thereon are likewise misleading. This statement also lacks meaningful cautionary language. The only cautionary language was given at the beginning of the call, but this constitutes boilerplate language that is not meaningful. *See infra* n.20, Defs.' Ex. 21 at 2, 13, ECF No. 39-16; *Carlton*, 184 F. Supp. 3d at 454.

the cause of the rise in delinquencies is plausibly material because an investor would have considered that this altered the basic mix of information, including whether the problem was reasonably resolved and would have a shorter or longer-term impact on Conn's financial performance. Thus, the statements could have misled investors to the extent that Conn's failed to disclose the full picture and the primary cause of rising delinquencies that was not in fact remedied. *See, e.g.*, *Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007) (denying motion to dismiss because even though "the market knew of the general problems regarding the company's proved reserve estimates, there are factual issues concerning whether the full extent and effect of those problems was known at that time."). Furthermore, the District Judge upheld similar statements as actionable in the Class Action, so these should be upheld for the same reasons.[17] Defendants' motion should be denied as to statements in paragraphs 111, 113, 114, 116, 126-27 in the complaint.

---

[17] *See* Order, *In re Conn's, Inc., Sec. Litig.*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125; Mot. Hr'g Tr. at 111:14-123:6, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (upholding statements in paragraph 96 in the Class Action Fourth Amended Complaint); Mot. Hr'g Tr. at 3:25-29:20, 31:12-34:16, 40:4-41:1, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 118 (upholding statements in paragraphs 97, 99, and 111 in the Class Action Fourth Amended Complaint).

**5. Defendants contend certain statements challenged by Plaintiffs are protected by the PSLR's safe harbor.**

### a. Applicable legal standard for PSLRA's safe harbor.

"With regard to misstatements, the PSLRA establishes a 'safe harbor' protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading." *In re BP*, 843 F. Supp. 2d at 747 (citing 15 U.S.C. § 78u-5(c)(1)(A)). A statement is forward-looking if it is:

(A)  a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B)  a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C)  a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D)  any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E)  any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

*Id*. (quoting 15 U.S.C. § 78u-5(i)(1)(A)). A defendant "shall not be liable with respect to any forward-looking statement, whether written or oral, if":

(A) the forward-looking statement is—

21

> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement—
>
> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading[.]

*Carlton*, 184 F. Supp. 3d at 452-53 (quoting 15 U.S.C. § 78u-5(c)(1)). Under Fifth Circuit precedent, the safe harbor provision has independent prongs. *Id*. at 453 (citation omitted).

> Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts.

*In re BP*, 843 F. Supp. 2d at 748 (citation omitted).

### b. Analysis.

Defendants contend the following statements are forward-looking:

- "[T]he amount of the loss for an individual loan, yes, would increase with larger balances. But that doesn't necessarily mean that the rate would increase. … And we don't think the loss rate for portfolio should be materially different with a slightly larger average balance size. … But we don't believe that the modest increase in average loan size is going to significantly affect the portfolio loss rates." ECF No. 3 at ¶ 109 (Wright, Second Quarter FY 2014 Earnings Call on Sept. 5, 2013).

- "Results so far indicate that performance of current-year originations is within expectations." *Id*. at ¶ 110 (Poppe, Second Quarter FY 2014

22

Earnings Call on Sept. 5, 2013).

Plaintiffs contend the safe harbor does not apply because even forward-looking statements are actionable if made with knowledge of their falsity. ECF No. 3 at ¶¶ 227, 229. Regarding the statement in paragraph 109, Plaintiffs contend it is false because Wright "created the false impression that increase in the average customer balance was not materially impacting Conn's credit portfolio losses…." ECF No. 57-1 at 18. However, Wright compared different types of metrics and Plaintiffs do not appear to challenge the accuracy of the underlying numbers. Plaintiffs have not sufficiently pleaded that this statement was false when made or that Wright knew this to be false.

Regarding the statement in paragraph 110, Plaintiffs contend it is misleading because "Defendants did not disclose that Conn's had increased originations by lowering acceptable FICO scores and reducing other underwriting criteria…." and "Defendants knew (but did not disclose) that performance of current loan originations had been and was expected to be poor…." *Id*. at 19-20. However, what might fall "within expectations" is too vague to be actionable. *See, e.g., In re BP*, 843 F. Supp. 2d at 774-75 (dismissing statements as too vague to be actionable). Plaintiffs point to no contrary information or report about what Conn's specific expectations were. Plaintiffs also argue that, to the extent Defendants' statements concern then-present and historical conditions, they are not protected by the safe

23

harbor. ECF No. 47 at 20-21. The Court agrees that this statement is not forward-looking; however, Plaintiffs must still plead why the statement is false and failed to do so.

Defendants contend the following statements are opinions or mere puffery:

- "[T]he standard credit score is not a reliable predictor of credit performance at lower scores given our installment lending structure to purchase home necessities." ECF No. 3 at ¶ 90 (Poppe, Fourth Quarter FY 2013 Earnings Call on Apr. 3, 2013).

- "It is important to note that standard credit scores are not reliable predictors of customer performance at lower scores." *Id*. at ¶ 100 (Poppe, First Quarter FY 2014 Earnings Call on June 6, 2013).

- Wright told Plaintiffs that Conn's problems related to "semi-retarded investors." *Id*. at ¶ 119 (Wright, Sept. 20, 2013 e-mail to Plaintiffs' Representative).

- Wright denied an investor's comments that Conn's was growing at a reckless speed. *Id*. at ¶ 121 (Wright, Dec. 3, 2013 e-mail to Plaintiffs' Representative).

- "Many years of experience underwriting a single type of credit for our core customer limited variation in underwriting practices over time, and experience collecting this specific type of credit, allows us to deliver consistent performance." *Id*. at ¶ 123 (Poppe, Third Quarter FY 2014 Earnings Call on Dec. 5, 2013).

The Court agrees that these statements are opinions and therefore not actionable. The statement in paragraph 123, additionally, is optimistic puffery. "[I]t is well established that generalized positive statements about a company's progress are not a basis for liability." *Carlton*, 184 F. Supp. 3d at 493 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001)) (statements that "we are seeing

significant operational progress … and we believe that we are turning the corner toward steady-state operations" are vague assertions of corporate optimism); *see also In re BP*, 843 F. Supp. 2d at 775 ("'[G]eneralized positive statements about the company's competitive strengths, experienced management, and future prospects' are immaterial.") (citation omitted). Regarding the statements in paragraphs 90 and 100, the District Judge struck a similar statement in the Class Action.[18] Defendants' motion should be granted as to the statements in paragraphs 90, 100, 109, 110, 119, 121, and 123 in the complaint.

### 6.  Plaintiffs challenge Conn's financial statements.

Plaintiffs allege that Conn's Fourth Quarter FY 2013, FY 2013, First Quarter FY 2014, Second Quarter FY 2014, and Third Quarter FY 2014 financial reports in Conn's press releases, annual 10-K form, and quarterly 10-Q forms dated April 3, 2013, April 5, 2013, June 6, 2013, September 5, 2013, and December 6, 2013 are false. ECF No. 3 at ¶¶ 143-52. Plaintiffs further allege that Wright's and Taylor's Sarbanes-Oxley ("SOX") certifications were false when made on the above-referenced annual 10-K and quarterly 10-Q forms filed with the SEC.[19] *Id*. at ¶ 174.

Plaintiffs allege that Conn's understated and failed to properly account for

---

[18] *See* Mot. Hr'g Tr. at 56:11-57:6, 91:9-92:12, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Apr. 8, 2016), ECF No. 117 (striking paragraph 69 in the Class Action Fourth Amended Complaint).

[19] "Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724 (W.D. Tex. 2010) (citing 15 U.S.C. § 7241(a)).

doubtful accounts and provision for bad debt, which caused Conn's assets (or accounts receivable ("A/R")) and earnings per share ("EPS") to be overstated. *Id*. at ¶ 141. Plaintiffs allege the failure to properly establish a reserve for uncollectible accounts violated Generally Accepted Accounting Principles ("GAAP") and SEC accounting rules, which require Defendants to provide "reserves" for all receivables where uncollectability is "probable" and can be estimated. *Id*. at ¶¶ 141, 153, 157, 168. Plaintiffs allege that Defendants failed to follow GAAP accounting practices because even though delinquencies and the 60+ days past due balances were rising, Conn's allowance for doubtful accounts as a percentage of its receivables 60+ days past due was decreasing. *Id*. at ¶¶ 157(d), 159-67. Plaintiffs make numerous circumstantial allegations that Defendants extended credit to riskier customers, delinquencies were rising, lower underwriting standards caused the rise in delinquencies, and therefore the financial reports must have been inaccurate. *Id*. at ¶¶ 8, 10, 42, 50, 53, 54, 58, 62-69, 77, 85, 86, 157-63.

Defendants contend the financial statements and SOX certifications are not actionable because: (1) Plaintiffs failed to plead with particularity any facts showing the statements are false, (2) Plaintiffs failed to plead particularized facts showing how Conn's miscalculated debt reserves or otherwise violated GAAP, (3) Conn's to date has not been required to restate its financials, (4) none of the CW allegations or internal documents cited in the complaint discuss Conn's financial statements or

suggest bad debt reserves were understated, and (5) Plaintiffs failed to plead scienter.[20] ECF No. 55-1 at 13, 16-18, 24-26, 43-46, 53-55.

While Plaintiffs are permitted to rely on circumstantial allegations as they do here, these allegations fall short of pleading that the financial statements are actionable. Plaintiffs primarily draw their allegations from a letter the SEC sent to Defendants, requesting more information about why the percentage of bad debt allowance to account balances 60+ days past due decreased when the account balance of 60+ days past due was increasing. ECF No. 3 at ¶¶ 163-65. However, from the face of the complaint, the Court cannot infer that this metric is necessarily false or materially so, nor whether this is even the most pertinent metric. While Plaintiffs need not go so far to allege a specific amount for how much the allowance for doubtful accounts or bad debt provision should have been increased, Plaintiffs have not alleged even an estimate of how far off these numbers were to indicate whether the understatement was material.[21] Furthermore, the fact that the SEC

---

[20] Defendants also contend that some of these are forward-looking and protected under the PSLRA's safe harbor. ECF No. 39 at 21 n.9. However, Plaintiffs cite several cases indicating that financial statements such as 10-K and 10-Q forms filed with the SEC are not subject to the safe harbor. ECF No. 47 at 20 n.18 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 767-68 (2d Cir. 2010); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008); *Baker v. MBNA Corp.*, No. 05-272, 2007 WL 2009673, at *5 (D. Del. July 6, 2007); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1171 (N.D. Ill. 2004)).

[21] *See, e.g.*, *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 536 (5th Cir. 2008) (reversing denial of motion to dismiss where plaintiffs "make no attempt to estimate by how much the earnings were inflated").

requested more information or initiated an investigation does not necessarily mean that the financial reports were fraudulently false or even false at all.[22] Although the SEC filed a complaint against Conn's and Poppe and they entered consent judgments, the Defendants expressed they were not admitting any of the allegations in the complaint. ECF Nos. 62-1, 62-3 at 2, 62-4 at 2.[23]

In addition to the SEC investigation, Plaintiffs rely on the following post-Relevant Period allegations to show the financial reports were false when made:

- In Conn's financial reports for FY 2015, Conn's significantly increased its allowance for doubtful accounts and bad debt provision. ECF No. 3 at ¶¶ 169, 187.

- In FY 2015 conference calls, Wright stated that over the prior year, (1) Conn's tightened underwriting standards and discontinued certain marketing messages to new customers, (2) growth in the portfolio and originations to new customers caused the Relevant Period's increase in delinquencies, and (3) provision for loan losses were adjusted to account for increases in delinquencies. *Id*. at ¶¶ 170, 189-91.

- After the Relevant Period, Conn's established a Credit Risk and Compliance Committee and initiated a search for a Chief Risk Officer to deal with credit issues. *Id*. at ¶¶ 172, 179.

[22] In their opposition brief, Plaintiffs allege that in Conn's FY 2013 10-K form, Conn's conceded that, pending the outcome of the SEC investigation, there may be "a potential restatement of our financial statements." ECF No. 47 at 24 n.25; Pls.' Ex. 19 at 24, ECF No. 44-2. However, this was not in the complaint and this potential may never materialize. Even so, the fact of a restatement does not mean the original form was fraudulent.

[23] Plaintiffs filed a request for the Court to take judicial notice of the SEC's complaint against Conn's and Poppe and the consent judgments entered in that case. ECF No. 62. The Court reviewed those documents and takes judicial notice of the information contained in them. The Court granted Plaintiff's motion. Order, ECF No. 64. However, the SEC's complaint specifies that it is pleading a claim based on negligence and that the SEC need not prove scienter. ECF No. 62-1 at 6, 11. Thus, there is nothing that shows the Defendants were actually aware of the falsity of the financial reports at the time.

- In March 2014, Conn's staff sent an e-mail to Poppe stating that Conn's credit manual was outdated and had not been updated in over a year. ECF No. 3 at ¶ 177; Pls.' Ex. 18 at 37-38, ECF No. 47-4. Plaintiffs claim this shows Conn's lacked internal controls. ECF No. 3 at ¶ 177.

However, none of these later statements suggest that the financial statements made during the Relevant Period were false or misleading. This amounts to pleading "fraud by hindsight" which is not an actionable claim.[24] *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005); *see also Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-33 (5th Cir. 2002) (where "plaintiffs have not pointed to any particular reports or information … that are contrary to the restatements[,]" allegations that senior executive defendants received "unidentified daily, weekly, and monthly financial reports that apprised them of the company's true financial status" were insufficient to show scienter and that financial statements were false); *Stockman v. Flotek Indus., Inc.*, No. H-09-2526, 2010 WL 3785586, at *15 (S.D.

---

[24] "The Fifth Circuit defines 'fraud by hindsight' as a 'case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly' or 'a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later.'" *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 741 (N.D. Tex. 2018) (quoting *Lormand*, 565 F.3d at 248-49); *see also Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1249 (10th Cir. 2016) (announcement of forward loss made more than two months after alleged misstatement did not contribute to inference of scienter because it did not allege that defendant was aware the alleged misstatement was false when made two months earlier, and at most "suggest[s] an honest mistake in predicting [defendant's] future production and costs"); *Southland Sec. v. INSpire Ins. Sols*., 365 F.3d 353, 383 (5th Cir. 2004) (because fraud cannot be proved by hindsight, subsequent decline, lawsuits, or resignations are not persuasive of scienter because they "do not show what any particular individual knew, or was severely reckless in not knowing, at the time" of the alleged misstatements).

Tex. Sept. 29, 2010) (earnings guidance was not actionable where plaintiffs failed to point to any specific internal projections that contradict it).

Plaintiffs cite *In re Triton* for the proposition that "[t]o withstand a motion to dismiss, it is enough that plaintiffs alleged a violation of accounting standards and stated such violation resulted in material misstatement." ECF No. 47 at 22 n.22 (quoting *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at \*23 (E.D. Tex. Mar. 30, 2011)). However, Plaintiffs must still satisfy the heightened pleading standards under the PSLRA and cannot withstand a motion to dismiss with conclusory allegations.[25]

Plaintiffs cite other cases in which courts denied motions to dismiss involving allegations of accounting fraud—including allegations that loan loss reserves were understated—but these are distinguishable because those plaintiffs alleged facts with greater particularity.[26] Thus, Defendants' motion should be granted as to the

---

[25] In addition, some of the challenged statements are press releases with no individual speaker identified, other than the corporation. ECF No. 3 at ¶¶ 143, 146, 148, 149, 151; *see, e.g.*, *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (affirming grant of motion to dismiss section 10(b) claim as to press releases for which plaintiffs failed to identify a speaker), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005) (same). The Court construes the 10-K and 10-Q forms as being attributed to Wright and Taylor because they signed the forms. *See, e.g.*, *In re BP*, 843 F. Supp. 2d at 749 ("[C]orporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears….") (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006)).

[26] Plaintiff cited the following cases, which are distinguishable. *See Barrie*, 397 F.3d at 257, 264 (denying motion to dismiss in part where allegations of accounting fraud and GAAP violations were supported by sworn expert analysis and CW allegations by witness who was directed by defendant to investigate accounting practices and submitted an accounting to defendants which defendants ignored); *Parmelee v. Santander Consumer USA Holdings, Inc.*, No. 3:16-CV-782,

statements in paragraphs 143-52 in the complaint. *See Southland*, 365 F.3d at 383 (granting motion to dismiss allegations of inflated revenues and failure to record losses for uncollectible receivables); *In re Alamosa*, 382 F. Supp. 2d at 852-55 (granting motion to dismiss allegations that defendants did not make sufficient allowances for uncollectible accounts).[27]

### C. Scienter.

#### 1. Wright.

The Court recommended that 12 statements Wright made remain as actionable. *See supra*, section III.B. The Court must still determine whether Plaintiffs adequately pleaded scienter for those statements and holds that they have. The Court relies on the District Judge's ruling on defendants' motion to dismiss in the Class Action. *See* Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125. Although the District Judge did not explicitly explain his

---

2018 WL 276338, at *4-6 (N.D. Tex. Jan. 3, 2018) (denying motion to dismiss where company's financial restatements gave rise to strong inference of scienter); *In re ArthroCare*, 726 F. Supp. 2d at 721-22 (same); *In re Netbank, Inc., Sec. Litig.*, No. 1:07-CV-2298, 2009 WL 2432359, at *7 (N.D. Ga. Jan. 29, 2009) (denying motion to dismiss where defendants' own internal analysis showed it needed to increase loan loss reserves). Plaintiff also cited a case that was decided before the PSLRA was passed to heighten pleading standards for securities fraud and is outdated. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993) (denying motion to dismiss where plaintiffs alleged defendants understated loan loss reserves by at least $350 million), *superseded by statute as stated in Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063-64 (9th Cir. 2000).

[27] *See also*, *e.g.*, *Shaw Grp.*, 537 F.3d at 535-36 (reversing denial of motion to dismiss where complaint lacked facts common in "most securities fraud cases, which are precipitated when the company announces such revelations as a restatement in earnings due to accounting mistakes…. [and] there was no mea culpa from the company in the form of acknowledge wrongdoing or restated financial reports, … nor any publicly expressed reservations by the auditors….").

holding regarding scienter allegations, by partially denying the defendants' motion to dismiss, the District Judge implicitly found the Fourth Amended Complaint adequately pleaded scienter as to Wright, at least for the statements that were found actionable, many of which are challenged here or are similar. *Id*. In the Class Action, the plaintiffs' scienter allegations for the Individual Defendants consisted of CW allegations, post-Relevant Period statements, allegations of insider trading, and allegations regarding Defendants' positions and motive. *See* Fourth Am. Compl., *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. Here, Plaintiffs rely on the same allegations in addition to Conn's internal documents, the SEC investigation, Wright's departure from Conn's, and his SOX certifications. ECF No. 3. While the Court must ultimately consider the scienter allegations collectively, the Court addresses each separately first for ease of discussion.

### a. Confidential witness allegations.

Plaintiffs rely on the following CW allegations to plead scienter as to Wright (and Poppe):[28]

---

[28] Defendants contend that all of Plaintiffs' CW allegations should be struck because Plaintiffs copied those allegations from the Class Action Fourth Amended Complaint and did not independently verify them. ECF No. 39 at 14-15. Defendants allege this violated Plaintiffs' counsel's Rule 11 duties. *Id*. Plaintiffs respond that the CW allegations should be upheld because the District Judge already upheld them in the Class Action, and they cite authorities indicating that copying allegations from other complaints is not impermissible, particularly when, as here, they are supported by other materials personally investigated by the plaintiff. ECF No. 47 at 29-31. Other than one Supreme Court case discussing Rule 11 generally, the parties do not cite any applicable authority from the Fifth Circuit or its district courts. Nevertheless, Defendants' concerns are mitigated because (1) the District Judge already upheld the same CW allegations in the Class

- CW-1, a former Conn's Senior Manager of Collections Strategy, allegedly sent daily reports to both Wright and Poppe containing detailed analytics and metrics, including first payment defaults ("FPDs") and delinquencies. *Id.* at ¶¶ 42(b), 70.

- CW-2, a former Conn's Credit Manager, alleged that Wright and Poppe were aware that relaxed underwriting standards adversely impacted the business because they were hands-on in the credit department, came into the credit department three to four times per week, and had face-to-face meetings with credit managers. *Id.* at ¶¶ 42(i), 71. CW-2 allegedly reported these credit issues directly to executives including Wright and Poppe. *Id.* at ¶ 42(i).

- CW-3, a former Conn's credit underwriter, alleged Conn's lowered underwriting standards including by modifying its auto approval algorithm to automatically approve customers it previously would not have approved. *Id.* at ¶ 56. Plaintiffs also allege that, according to internal documents, algorithm modifications needed to be approved by the CEO (Wright) and COO (Poppe). *Id.*; Pls.' Ex. 2 at 11, ECF No. 47-3.

- CW-4, a former Conn's District Manager, allegedly attended quarterly meetings with Wright at which the amount of credit approved and utilized during store openings was discussed. ECF No. 3 at ¶ 71.

- CW-5, the former Conn's Vice President of Credit, alleged Conn's was a relatively "flat" organization, so management was frequently involved in

---

Action, (2) the MicroCapital Plaintiffs were previously plaintiffs in the Class Action and the CW allegations were already alleged on their behalf there before they opted out and filed their own lawsuit, and (3) Plaintiffs certified that their complaint is based on various sources including internal Conn's documents and depositions of Conn's current and/or former employees. ECF No. 3 at ¶ 1. Indeed, the complaint references in great detail other sources which corroborate the CW allegations. "Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014); *cf. Main State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (granting motion to strike allegations lifted from other complaints where plaintiffs' counsel did not claim to have taken any measures to independently investigate the bases for those allegations); *In re Connetics*, 542 F. Supp. 2d at 1005-06 (granting motion to strike paragraphs copied from SEC complaint where plaintiffs "make no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims against defendants."). The CW allegations should not be struck.

day-to-day issues like collections. *Id.* CW-5 allegedly met with Conn's executives daily to discuss the status of collections and delinquencies. *Id.*[29]

"Confidential source statements are a permissible basis on which to make an inference of scienter."[30] *Carlton*, 184 F. Supp. 3d at 460 (quoting *Cent. Laborers' Pension Fund*, 497 F.3d at 552). However, even when confidential source statements are adequately pleaded, the Fifth Circuit requires district courts to give less weight to and "'discount allegations from confidential sources' because they 'afford no basis for drawing plausible competing inferences.'" *Id.* (quoting *Shaw Grp.*, 537 F.3d at 535).

Standing alone, the CW allegations fall short of raising a strong inference of scienter because some courts have found similar CW allegations that defendants received unspecified reports or attended frequent meetings through which they learned information contrary to their alleged misstatements insufficient.[31] However,

---

[29] Plaintiffs also point to statements that Conn's Vice President of Credit Strategy made about Conn's bad lending practices and deteriorating credit portfolio. ECF No. 3 at ¶¶ 10, 51, 61, 69(b), 77, 82, 134(b); Pls.' Ex. 14 at 20, ECF No. 47-4. However, his statements do not necessarily show scienter or the Individual Defendants' knowledge.

[30] Though a plaintiff does not have to state the names of the CWs, there must be sufficient particularized details "to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements" such as "(1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter, such as when a relevant comment was made to the confidential source." *Carlton*, 184 F. Supp. 3d at 460 (citations omitted).

[31] *See, e.g.*, *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (for allegations concerning internal reports to support a strong inference of scienter, there must be "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients" and that defendant actually read them) (citations omitted); *Southland*, 365 F.3d at 370 ("An unsupported

while Plaintiffs do not describe in detail the content of each daily report given to Wright or the matters discussed in each meeting he attended, when considered holistically with other allegations in the complaint—and because the District Judge implicitly credited the CW allegations in the Class Action— there is enough context to infer that the reports and other information shared with Wright showed delinquencies were rising because of lower underwriting standards. Therefore, when considered holistically, the CW allegations contribute to a strong inference of scienter against Wright.[32]

### b. Post-Relevant Period statements.

Plaintiffs allege post-Relevant Period statements Wright made demonstrate

---

general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss."); *In re ArthroCare*, 726 F. Supp. 2d at 719 (CW allegations, alone, did not raise a strong inference of scienter where "[t]here is hardly a single instance in which one of the CWs alleges they had a conversation with or overhead a comment by either [defendant] and also states when and where the conversation occurred. Many of the CWs simply state their own conclusions about what occurred … For instance, CW 10 states that [defendant] attended 'weekly staff meetings every Tuesday or Wednesday that were attended by all the top executives and lasted for about 90 minutes,' and solely on this basis concludes that all the executives in the meetings 'knew what was going on'….").

[32] *See, e.g.*, *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736, 2015 WL 5766870, at *6 (E.D. Tex. Sept. 29, 2015) (allegations that defendants were aware of facts undermining their statements because inventory purchases were the subject of monthly meetings and regular review by defendants, in combination with other allegations, contributed to a strong inference of scienter); *Brody v. Zix Corp.*, No. 3:04-CV-1931, 2006 U.S. Dist. LEXIS 69302, at *20 (N.D. Tex. Sept. 26, 2006) (CW allegations that defendants regularly received tracking reports which would have alerted them to the fact that their statements were materially misleading contributed to a strong inference of scienter); *In re Fleming Co. Inc. Sec. & Deriv. Litig.*, No. CIVA503MD1530, 2004 WL 5278716, at *28-34 (E.D. Tex. June 16, 2004) (CW allegations that defendants received weekly reports and attended weekly meetings concerning data on financial performance contributed to a strong inference of scienter).

his knowledge during the Relevant Period. ECF No. 3 at ¶¶ 17, 52, 72, 54-55, 189, 194-95. For example, Plaintiffs allege that Wright admitted in a September 22, 2014 investor and analyst meeting that "when we opened the first four stores we opened back in 2013, we did [reduce credit quality] … a little bit and it took us about three months to figure out that was a really bad idea." *Id*. at ¶ 72. Wright also testified he recalled that in late 2012, Conn's reduced verification and down payment requirements for customers in new stores. *Id*. at ¶ 54-55. These contribute to an inference of scienter that by about March or April 2013, Wright knew that Conn's lowered underwriting standards and delinquencies were rising because of lower underwriting. *See, e.g.*, *Lormand*, 565 F.3d at 254 (post-Relevant Period admissions regarding defendants' own state of mind at the time of their misrepresentations raise a strong inference of scienter).

### c. Insider trading.

Plaintiffs also allege Wright sold stock based on his inside information about the deterioration of the credit portfolio, which allowed him to benefit from artificially inflated stock prices. ECF No. 3 at ¶¶ 11, 212-13. Plaintiffs allege Wright sold 15,000 shares each on June 20, 2013 and December 17, 2013 for the first time since 2007, gaining proceeds of $1,932,450. *Id*. at ¶ 213. Plaintiffs allege the timing is suspicious because in June, "Defendants were setting expectations regarding the quality of Conn's credit[.]" *Id*. at ¶ 213. As for the December trade, it was

purportedly suspicious because it was made (1) less than two weeks after Wright denied Conn's was reckless in its growth, (2) immediately after he assured investors that Conn's credit problems were due to systems issues, (3) on the heels of his false statements, and (3) eight weeks before the stock would fall due to news of greater delinquency rates. *Id*. at ¶ 213.

"Insider trading alone cannot create a strong inference of scienter, but it may meaningfully enhance the strength of the inference of scienter." *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharm., Inc.*, No. H-06-3022, 2007 WL 2720074, at \*5 (S.D. Tex. Sept. 18, 2007). "Because corporate executives are often paid in stock and stock options, they will naturally trade those securities in the normal course of events, and courts will not infer fraudulent intent from the mere fact that some officers sold stock." *Carlton*, 184 F. Supp. 3d at 480 (quoting *Shaw Grp.*, 537 F.3d at 543) (internal quotation marks omitted). Insider trading allegations may enhance the inference of scienter when the trades occur in suspicious amounts, at suspicious times calculated to maximize personal profit, or are out of line with prior trading practices. *Id*. (citations omitted). On the other hand, when a defendant regularly sells stock, does not sell stock immediately following an alleged material misstatement, or sells stock but the price continues to climb, these circumstances do not strengthen the inference of scienter. *Id*. at 481; *In re TETRA Tech., Inc. Sec. Litig.*, No. 4:08-CV-965, 2009 WL 6325540, at \*7 (S.D. Tex. July 9, 2009),

*clarified*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) (Ellison, J.).

As to timing, while Plaintiffs allege Wright sold stock during the Relevant Period and generally after making false and misleading statements, Wright does not appear to have sold stock immediately after the alleged misstatements to take advantage of a spike in stock prices, nor have Plaintiffs alleged that Wright sold stock at a time when the stock price peaked. To the contrary, Defendants assert that Wright's sales were made when Conn's stock was not at its highest price and well before the February 2014 alleged corrective disclosures. ECF No. 39 at 28; *see, e.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (stock sales did not raise an inference of scienter because they were made when stock prices were below the alleged Class Period high); *Stockman*, 2010 WL 3785586, at *28 (same).

Furthermore, while the cash value of the stock proceeds seems high and Plaintiffs contend Wright had not sold stock since 2007, Defendants contend that Wright's stock sales represented a small percentage of his total shares. ECF No. 39 at 27. Each sale constituted 9.55% and 7.49% of his total shares. *Id*. Courts have held that such small percentages do not raise a strong inference of scienter. *See In re TETRA*, 2009 WL 6325540, at *7 ("If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter."); *Oppenheim,* 2007 WL 2720074, at *5 (where defendants sold 17.59% and 13.79% of their total shares, sales did not contribute to a strong inference of

scienter). These allegations contribute only slightly to an inference of scienter against Wright due to his trading history.

### d. Position and motive.

Plaintiffs allege that Wright and each of the Individual Defendants had knowledge given their positions in the company, their experience and background including in accounting, their focus on credit operations as part of their job duties, and their day-to-day involvement in the operations of the company. ECF No. 3 at ¶¶ 38-41, 200. Plaintiffs allege the Individual Defendants routinely represented to analysts and investors that they monitored and were knowledgeable about Conn's finances including credit operations. *Id*. at ¶ 201. Plaintiffs allege the Individual Defendants had motive and incentive to engage in the alleged fraud because they could receive performance-based bonuses and equity.[33] *Id*. at ¶¶ 206-08, 211.

While allegations of motive and opportunity alone will not support a strong inference of scienter, they may "meaningfully enhance the strength of the inference of scienter." *In re BP*, 843 F. Supp. 2d at 749 (citation omitted). However, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is

---

[33] Defendants allege that Plaintiffs rely on group pleading, which is impermissible in the Fifth Circuit. ECF No. 39 at 24; *In re BP*, 2013 U.S. Dist. LEXIS 171459, at *51-52 (citing *Shaw Grp.*, 537 F.3d at 533-34). But, "[t]he fact that [some] allegations pertain to more than one person does not make them group pleading[,]" particularly where, as here, it is sufficiently clear from the face of the complaint which scienter allegations apply to each Individual Defendant. *Alaska Elec. Pension Fund v. Asar*, No. 17-50162, 2019 WL 1567766, at *7 (5th Cir. 2019).

predicated. … [W]ere the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations." *Carlton*, 184 F. Supp. 3d at 481 (quoting *Abrams*, 292 F.3d at 434) (allegations that defendant was motivated to continue receiving lucrative salary and compensation did not raise a strong inference of scienter). In addition, "[c]orporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded." *In re BP*, 843 F. Supp. 2d at 749 (citation omitted); *see also Carlton*, 184 F. Supp. 3d at 478-79 (allegations that defendants must have known the misstatements were false based on their high-level positions within the company did not raise a strong inference of scienter). Plaintiffs' allegations based on motive and Defendants' positions at Conn's contribute little, if at all, to an inference of scienter.

### e. *Conn's internal documents.*

Plaintiffs point to Conn's internal documents to plead that Wright knew the underwriting standards were being loosened and that the rise in FPDs was due primarily to new store underwriting:

- In a **January 31, 2013** e-mail that Poppe sent to other Conn's staff, Poppe stated that he discussed underwriting requirements for new stores with Wright and decided against "keeping the gates wide open like we were the past 2 months." ECF No. 3 at ¶ 65; Pls.' Ex. 7 at 32, ECF No. 47-3.

- On **March 30, 2013,** Poppe sent an e-mail to Wright attributing the rising FPDs to underwriting standards in new stores and explaining that credit verifications were tightened to avoid fraud. ECF No. 3 at ¶ 10; Defs.'

40

Ex. 17, ECF No. 40-4.

- On **April 12, 2013**, Poppe sent an e-mail to Wright referring to their prior conversation about keeping lower underwriting standards (lower minimum FICO score cut-offs) in place for new stores permanently going forward. ECF No. 3 at ¶ 73; Defs.' Ex. 19 at 2, ECF No. 40-6.

- In July 2013, Wright sent a memorandum to the Conn's Board, noting that the "'grand opening' practices at the new stores opened in November and December" had an impact on credit performance and was at least one causal factor. ECF No. 3 at ¶ 134(a); Defs.' Ex. 24 at 4, ECF No. 40-10.[34]

While the Plaintiffs do not necessarily plead facts that Wright read the e-mails sent to him, the e-mails referring to conversations involving him and his memorandum to the Board raise the inference that by early 2013, Wright knew Conn's lowered underwriting standards and this contributed to a rise in delinquencies. In addition, the omission of facts that Wright read the e-mails is offset somewhat by the CW allegations and Wright's later statement that, after Conn's opened new stores in early 2013, it took "about three months to figure out that was a really bad idea." ECF No. 3 at ¶ 72. Standing alone, these documents raise only a slight inference of scienter against Wright, but when considered together with other allegations, contribute to a strong inference of scienter.

---

[34] Plaintiffs also make general statements that based on internal e-mails, "it was known internally at Conn's that the lowering of Conn's underwriting standards to 'significantly riskier' customers … 'represent[ed] a straight loss for the lender.'" ECF No. 3 at ¶ 50; Defs.' Ex. 25 at 3, ECF No. 40-11. However, at least some of these internal e-mails and documents were not sent to or from any of the Individual Defendants so they cannot show scienter as to Defendants. *See* Defs.' Ex. 25 at 2-3, ECF No. 40-11; Pls.' Ex. 14 at 20, ECF No. 47-4.

### f. SEC investigation.

Plaintiffs allege that Conn's disclosed on December 10, 2014 that the SEC began investigating Conn's. *Id.* at ¶¶ 19, 157(d), 163-66, 172. However, "[g]overnment investigations can result from any number of causes, and the investors have not pointed to any facts suggesting that the SEC investigation was the result of knowing or reckless behavior by the Defendants[,]" nor have they alleged any facts regarding the outcome of the investigation. *Carlton*, 184 F. Supp. 3d at 480 (allegations of SEC investigation did not raise a strong inference of scienter) (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009)). Now, Plaintiffs ask the Court to take judicial notice of the outcome and filed the SEC complaint and the consent judgments against Conn's and Poppe. ECF No. 62. Because the SEC's claims are based on negligence and specifically acknowledge that the SEC does not need to prove scienter, those documents provide no support for the proposition of Defendants' actual knowledge at the time. ECF No. 62-1 at 6, 11. Moreover, the complaint was not asserted against Wright, but only Poppe. Therefore, this contributes little, if at all, to an inference of scienter.

### g. Termination.

Plaintiffs allege that Conn's announced on September 9, 2015—more than a year after the Relevant Period—that Wright would be replaced as CEO, but Plaintiffs do not allege any reason for his departure. ECF No. 3 at ¶ 20. Courts have held that

"[e]xecutive resignations are generally 'unavailing as proof of the commission of fraud.'" *Carlton*, 184 F. Supp. 3d at 478 (finding allegation of resignation alone insufficient to plead scienter) (citation omitted); *accord In re ArthroCare*, 726 F. Supp. 2d at 724-25 (same); *see also Neiman*, 854 F.3d at 752 (resignation did not raise an inference of scienter where there were no allegations as to the reason); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) ("the successive resignations of key officials … is more likely probative only of the fact that the company was failing."). Thus, Wright's departure contributes little, if at all, to an inference of scienter.

### h. Sarbanes-Oxley certifications.

Plaintiffs allege that Wright (and Taylor) signed SOX certifications on Conn's annual 10-K and quarterly 10-Q forms on April 5, 2013, June 6, 2013, September 5, 2013, and December 6, 2013, falsely certifying the financial reports were accurate. ECF No. 3 at ¶ 174. But Plaintiffs failed to show the financial statements were actionable, so they cannot show the SOX certifications raise an inference of scienter. *See supra*, section III.B.6. Even assuming Plaintiffs sufficiently pleaded that Defendants' financial statements were actionable, Plaintiffs failed to allege scienter as to those statements.[35]

---

[35] Plaintiffs' circumstantial allegations that Defendants knowingly increased Conn's credit risk by lowering underwriting standards, knowingly increased sales and extended greater amounts of credit to new "riskier" customers, and knew delinquencies were rising as a result do not go far

### *i.* *Collective allegations.*

While several of the aforementioned allegations fail to raise a strong inference of scienter with particularity if considered in isolation, the Court concludes they do when considered collectively, albeit barely so.[36] For example, the internal documents

_____

enough to show Defendants knew Conn's financial statements were materially misstated at the time. ECF No. 3 at ¶¶ 4, 10, 42(i), (r), 50, 52, 64, 68, 69(c), (d), 70, 72, 84, 157(a)-(b), 161, 162; ECF No. 57-1 at 9-12, 14-15, 23-26, 30-32. "[I]t is well-settled that Sarbanes-Oxley certifications, standing alone, are not indicative of scienter—otherwise, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company." *In re ArthroCare*, 726 F. Supp. 2d at 724 (citations omitted). "The certifications are probative of scienter only if the person signing … was severely reckless in certifying the accuracy of the financial statements." *In re Franklin*, 782 F. Supp. 2d at 396 (citing *Cent. Laborers' Pension Fund*, 497 F.3d at 550). "That is, there must be facts establishing that the person … had a 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'" *Id.* (citing *Cent. Laborers' Pension Fund*, 497 F.3d at 550) (SOX certifications failed to support a strong inference of scienter); *accord In re TETRA*, 2009 WL 6325540, at *31. Post-Relevant Period financial statements that included increased bad debt provisions likewise do not show that Defendants knew any financial statements issued during the Relevant Period were understated. *See* ECF No. 3 at ¶¶ 169-73; 180-99; *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199, 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016) (rejecting allegations that defendants' *later* increase in reserve estimates gave rise to a strong inference of scienter at the time of the alleged misstatements). This may be "sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." *Pirnik*, 2016 WL 5818590, at *8 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

[36] Plaintiffs' complaint approaches "puzzle pleading." *In re Alamosa*, 382 F. Supp. 2d at 857 (collecting cases that dismissed complaints for "puzzle pleading"); *accord In re Franklin*, 782 F. Supp. 2d at 384-85 (where "Plaintiffs group together all of the defendants' false statements made during the … conference call, press release, and Form 8-K, and allege collective reasons why the statements were materially false and misleading … this does not satisfy the requirement that, for *each* false or misleading statement, they are to explain the reason or reasons why the statement was misleading….") (emphasis in original). While Plaintiffs' complaint passes this threshold because in their section explaining why the statements are false, they cross reference the paragraph numbers of alleged misstatements in the prior section and relevant facts in yet another section, the complaint could more clearly and systematically identify each *actionable* statement and why *each* is actionable. *See, e.g.*, *Singh v. 21Vianet Grp., Inc.*, No. 2:14-CV-894, 2017 WL 4322483, at *2 (E.D. Tex. Sept. 13, 2017) (denying motion to dismiss where for each alleged misstatement, the complaint explains in the paragraph immediately after the alleged misstatement why it is misleading, and follows the same pattern for each statement), *report and recommendation adopted*, 2017 WL 4310154 (S.D. Tex. Sept. 28, 2017). This would conserve judicial resources and mitigate

are the only sources that provide a specific date on which Wright would have known the information contained therein. But, taking Plaintiffs' allegations as true, these documents combined with the CW allegations, post-Relevant Period statements, and other allegations raise a sufficiently strong inference of scienter that as early as April 2013, Wright knew that underwriting standards were lowered, and this was a cause of the rising delinquencies.

The Court must weigh competing inferences of scienter as to those statements the Court found actionable. Where there is an inference of scienter at least as cogent and compelling as opposing inferences—that Wright was at most negligent or committed no wrongdoing—such as here, "[a] tie favors the plaintiff." *Carlton*, 184 F. Supp. 3d at 484 (quoting *Lormand*, 565 F.3d at 254) (when considered holistically, allegations including CW allegations raised an inference that defendant acted with scienter which is at least as compelling as the inference that he acted without it).[37] Defendants' motion to dismiss Plaintiffs' securities fraud claim against

---

the need for supplemental briefing that the Court requested here. "However easy the puzzle, assembling puzzles is not the duty of the Court." *In re Alamosa*, 382 F. Supp. 2d at 857.

[37] *See also, e.g.*, *Stone v. Life P'ners Holdings, Inc.*, 26 F. Supp. 3d 575, 611 (W.D. Tex. 2014) (collectively, allegations of internal reports imputing knowledge, combined with other allegations, raised a strong inference of scienter); *In re ArthroCare*, 726 F. Supp. 2d at 725 (even though some allegations of scienter, standing alone, did not raise a strong inference of scienter, collectively, the role of defendants in the company, insider trading, SOX certifications, and other allegations gave rise to a strong inference of at least severe recklessness for a certain time period); *In re TETRA*, 2009 WL 6325540, at *38 (collectively, CW allegations that defendants attended relevant meetings to discuss insurance receivables and post-class statements raised a strong inference that defendants had knowledge).

Wright should be denied, to the extent some of his statements are actionable.

## 2. Poppe.

The Court recommended that five statements by Poppe remain as actionable. *See supra*, section III.B. The Court must still determine whether Plaintiffs adequately pleaded scienter as to those statements and holds that they have. The Court again relies on the fact that the District Judge implicitly found the Class Action Fourth Amended Complaint adequately pleaded scienter as to Poppe, at least for the statements that were found actionable in the Class Action, many of which are challenged here or are similar.[38] *See* Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125.

In addition to the CW allegations discussed above which pertain to both Wright and Poppe, Plaintiffs rely on additional CW allegations specific to Poppe to plead scienter.[39] Plaintiffs also make other similar scienter allegations against Poppe as they did against Wright involving (1) insider trading,[40] (2) motive to earn

---

[38] While the parties did not brief Conn's 10(b) liability for the corporate Defendant, "all misrepresentations attributable to Individual Defendants are also treated as having been made by [Conn's], as 'all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company.'" *In re BP*, 843 F. Supp. 2d at 788 (citation omitted). "Thus, the actionable misrepresentations discussed above that are attributable to [Wright and Poppe] are sufficient to give rise to an inference of scienter with respect to [Conn's]." *Id.*

[39] CW-1 reported that if the daily analytics reports were not circulated by 10:00 a.m. each day, Poppe would call or e-mail asking for the report. ECF No. 3 at ¶¶ 42(b), 70. CW-5 stated that data on FPDs and delinquencies were discussed each day across everyone involved in collections, including Poppe. *Id.* at ¶¶ 42(r), 70.

[40] Plaintiffs allege Poppe sold 30,000 shares on April 25, 2013 and 19,900 shares on October 21, 2013 for the first time since 2007, gaining proceeds of $2,581,911. ECF No. 3 at ¶ 213. Plaintiffs

performance-based compensation, (3) Poppe's departure and alleged firing on May 23, 2017, and (4) the SEC investigation.[41] ECF No. 3 at ¶¶ 11, 19-20, 157(d), 163-66, 172, 206, 209, 211-13. As with Wright, the CW allegations—when considered holistically with other allegations in the complaint—contribute to a strong inference of scienter while the latter allegations contribute little to an inference of scienter against Poppe.

### a. Conn's internal documents.

Plaintiffs also rely on numerous e-mails to and from Poppe, some of which had analytics reports attached:

- E-mails in **November and December 2012** suggest that Poppe knew about lower underwriting standards being implemented in new stores, that Conn's credit portfolio was shifting toward lower FICO scores, and that lower FICO scores were at least correlated with higher delinquency rates.

---

allege the timing is suspicious because in April, "Defendants were setting false expectations regarding the Company's credit risks." *Id*. As for the October trade, it was purportedly suspicious because it was made "on the heels of Defendants' false representations that Conn's credit issues related to a one-time computer system issue and omission[.]" *Id*. The timing allegations are somewhat more conclusory than the similar allegations against Wright. Defendants allege that Poppe's stock sales cannot support a strong inference of scienter because (1) the sales constituted relatively small percentages of Poppe's overall holdings (18.71% and 14.53%), (2) his April sales were made at $34 per share less than the peak price during the Relevant Period months before the February 2014 corrective disclosures, and (3) they were made pursuant to a Rule 10b5-1 plan. ECF No. 39 at 27-28 (citing *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008)). However, the 10b5-1 plan is an affirmative defense, which is irrelevant at the motion to dismiss stage. *In re ArthroCare*, 726 F. Supp. 2d 696, 722-23 (W.D. Tex. 2010). While Poppe's trading history makes these trades somewhat suspicious, the timing and percentage of his total holdings do not. These allegations contribute only slightly to an inference of scienter against Poppe.

[41] As discussed above, the SEC complaint and consent judgment against Poppe is based on a negligence standard and does not prove actual knowledge at the time. ECF No. 62-1 at 6, 11. The consent judgment also states that Poppe does not admit any of the allegations in the complaint. ECF No. 62-4 at 2.

*Id.* at ¶¶ 53, 61; Defs.' Ex. 14 at 2, ECF No. 40-1; Defs.' Ex. 15 at 2, ECF No. 40-2; Defs.' Ex. 26 at 2, ECF No. 40-12.

- E-mails from **January 2013** suggest that Poppe knew credit performance was declining; there were concerns about fraud in at least one new store, after which verification requirements were increased slightly for new applicants with FICO scores under 520; changes were made at the end of January to the underwriting process, which included offering credit to customers with zero FICO scores in new stores, but "not keeping the gates wide open like we were the past 2 months." ECF No. 3 at ¶¶ 53, 62, 64, 65; Pls.' Ex. 3-7, ECF No. 47-3; Defs.' Ex. 16 at 2-3, ECF No. 40-3.

- E-mails throughout **March 2013** suggest that Poppe knew that FPD rates were rising, particularly in new stores; he and colleagues were trying to determine the cause; and rising FPDs were attributed to new store underwriting. ECF No. 3 at ¶¶ 10, 68, 69(a); Pls.' Ex. 8 at 36-37, ECF No. 47-3; Defs.' Ex. 17, ECF No. 40-4; Defs.' Ex. 18 at 2, ECF No. 40-2.

- E-mails from late **April through May** suggest that Poppe was aware that credit performance was declining; delinquency rates in new stores were poor and described as "very shocking," "disturbing," and "off the rails;" and that implementation of the new Latitude system did not have a large impact on phone numbers and therefore likely did not affect delinquencies. ECF No. 3 at ¶¶ 53, 74, 76, 134(c); Pls.' Ex. 9-12, ECF No. 47-4; Defs.' Ex. 22 at 3, ECF No. 40-8.

- E-mails on **June 11-12 and in July** suggest that Poppe knew delinquencies and FPDs continued to worsen and the credit segment was still underperforming. ECF No. 3 at ¶¶ 77, 134(a); Pls.' Ex. 13 at 17, ECF No. 47-4; Pls.' Ex. 17 at 27-35, ECF No. 47-4; Defs.' Ex. 23 at 2-6, ECF No. 40-9.

- In an **October 2013** e-mail, Poppe acknowledged that September data on delinquencies was poor. ECF No. 3 at ¶ 78; Pls.' Ex. 15 at 22, ECF No. 47-4.

These allegations raise a strong inference of scienter that Poppe knew before and throughout the Relevant Period that underwriting standards were being lowered,

credit performance was deteriorating because of lower underwriting standards, and that the systems change was not responsible for performance deterioration (or at least not the primary cause).

### b. *Collective allegations.*

When considered collectively, Plaintiffs' allegations as to Poppe raise a strong inference of scienter for actionable statements he made. *See, e.g., Carlton*, 184 F. Supp. 3d at 476, 482-84; *Stone*, 26 F. Supp. 3d at 611; *In re ArthroCare*, 726 F. Supp. 2d at 725; *In re TETRA*, 2009 WL 6325540, at *38. Plaintiffs' scienter allegations for Poppe are significantly stronger than for Wright due to the volume, time frame, and specificity of e-mails which raise a strong inference that Poppe was informed about and actively engaged in discussions and efforts to lower underwriting standards, monitor credit performance, and determine the cause of rising delinquencies. This inference is more compelling than any competing theories. Defendants' motion to dismiss Plaintiffs' securities fraud claim against Poppe should be denied, to the extent some of his statements are actionable.

### 3. Taylor.

The only statements Plaintiffs contend are actionable against Taylor are the SOX certifications and corresponding financial statements he signed, which the Court found are not actionable. *See supra*, section III.B.6. Therefore, Plaintiffs

cannot establish scienter as to Taylor.[42] *See In re BP*, 843 F. Supp. 2d at 778 (dismissing defendant because where the alleged misrepresentations attributable to defendant were not actionable, plaintiffs cannot demonstrate scienter as to that defendant). Defendants' motion to dismiss Plaintiffs' securities fraud claim against Taylor should be granted.

# IV.
## CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

Section 20(a) of the SEA establishes control person liability:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*In re BP*, 2013 U.S. Dist. LEXIS 171459, at *54 (quoting 15 U.S.C. § 78t(a)). "[T]o prove a violation of section 20(a), a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP*, 843 F. Supp. 2d at 791 (citing *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir.

---

[42] Even if any statements attributable to Taylor are actionable, Plaintiffs still failed to plead scienter. Plaintiffs' only allegations of scienter as to Taylor—(1) his sudden departure from Conn's in December 2014, (2) motive to earn performance-based compensation, and (3) him signing the SOX certifications—do not raise a strong inference of scienter, even when considered collectively. ECF No. 3 at ¶¶ 18, 44, 174, 206, 210-11. Taylor was also dismissed from the Class Action. *See* Mot. Hr'g Tr. at 74:2-13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. July 14, 2015), ECF No. 102.

1990)). "Section 20(a) is a secondary liability provision[.]" *In re BP*, 2013 U.S. Dist. LEXIS 171459, at \*54 (citing *ABC Arbitrage*, 291 F.3d at 348 n.57).

Defendants' only argument for why Plaintiffs' section 20(a) claim should be dismissed is that Plaintiffs failed to plead a predicate violation under section 10(b). ECF No. 39 at 28. Because Plaintiffs failed to plead with particularity a primary violation under 10(b) against Taylor, Plaintiffs' section 20(a) claim against him fails and should be dismissed. *See In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 916 (finding no secondary control liability where plaintiffs failed to state a claim for securities fraud under Section 10(b) and Rule 10b-5); *accord Carlton*, 184 F. Supp. 3d at 495. However, because Plaintiffs successfully pleaded a primary violation under 10(b) against Wright and Poppe at least in part, Plaintiffs' 20(a) claims should remain to the extent the 10(b) claims based on actionable misstatements remain. *See In re TETRA*, 2009 WL 6325540, at \*38 ("Plaintiffs 20(a) claims remain only as to the claims based on misstatements" upheld as actionable); *accord Carlton*, 184 F. Supp. 3d at 495 (there is no basis for dismissing the control person claims against [defendant] because the § 10(b) claims against him have not been dismissed.").

## V.
## INSIDER TRADING UNDER SECTION 20A OF THE SECURITIES EXCHANGE ACT

"Section 20A provides for a private right of action to buyers and sellers of

securities who trade 'contemporaneously' with an insider in possession of material nonpublic information." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000). To state a section 20A claim, a plaintiff must plead that a defendant: "(1) used material, nonpublic information, (2) knew or recklessly disregarded that the information was material and nonpublic, and (3) traded contemporaneously with the [plaintiff]." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 916 (citations omitted). Both parties characterize the elements as requiring Plaintiff to state (1) a primary securities fraud violation under section 10(b) of the SEA and (2) that Plaintiffs traded "contemporaneously" with Wright and Poppe. ECF No. 39 at 29; ECF No. 47 at 31; *accord In re MicroStrategy*, 115 F. Supp. 2d at 662. Because the Court determined that Plaintiffs stated a claim under section 10(b) for at least some of Wright's and Poppe's alleged misstatements, Plaintiffs have stated a predicate securities fraud violation and the main issue is whether Plaintiffs' stock purchases were "contemporaneous."

The parties dispute the meaning of "contemporaneous." Defendants contend that "contemporaneous" means that the stock must have been traded on the same day. ECF No. 39 at 30. Plaintiffs contend that their purchases of Conn's stock one day after Poppe's April 25, 2013 sale, one day after Wright's December 17, 2013 sale, three days after Poppe's October 21, 2013 sale, and four days after Wright's June 20, 2013 sale are sufficiently "contemporaneous." ECF No. 47 at 31.

Reflective of the cases the parties cited, the Southern District of Texas has recognized that "[d]ifferent courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remained undisclosed.'" *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2599327, at \*5 (S.D. Tex. June 15, 2017) (citing *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003)). Since section 20A does not define "contemporaneous," some courts have taken the same-day approach to "guard against 'mak[ing] the insider liable to all the world'" and in consideration for "the increasingly dynamic nature of the securities markets." *In re MicroStrategy*, 115 F. Supp. 2d at 663-64 (collecting cases) (requiring trades to be made on the same day to be contemporaneous); *accord In re Fed. Nat'l Mortg. Ass'n Sec. Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 47-48 (D.D.C. 2007) (same); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) (same). But, a strict same-day rule means that

> insiders could trade near the close [of the trading day] and greatly reduce the universe of potential successful plaintiffs. On the other hand, interpreting "same day" to mean the 24-hour period after the insider's transaction presents a problem on motions to dismiss: most plaintiffs will only be able to determine the date—not the time—of the insider's transactions.

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008) (finding stock purchases the day after defendants' sales sufficiently

contemporaneous); *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (finding eight-day gap sufficiently contemporaneous).

Because of this wide range, the *In re Cobalt* court "[could] not conclude that an allegation of a six-day gap between [defendant's] sale and [plaintiff's] purchase is too long as a matter of law to constitute 'contemporaneous' trades…." 2017 WL 2599327, at *5.[43] This Court agrees. Defendants rely only on cases from other courts and have not cited any authority from the Fifth Circuit or its district courts that require application of a same-day-trading rule. Defendants failed to establish as a matter of law that Plaintiffs' section 20A claim must be dismissed at this stage. Defendants' motion to dismiss Plaintiffs' section 20A claim should be denied.

## VI.
## STATE LAW CLAIMS

Defendants argue that Plaintiffs' Texas and Connecticut common law claims for fraud and negligent misrepresentation should be dismissed because they are duplicative of Plaintiffs' section 10(b) securities fraud claim and must satisfy the particularity requirements of Rule 9(b). ECF No. 39 at 28-29. Plaintiffs contend that

---

[43] *See also, e.g., In re Enron*, 258 F. Supp. 2d at 600, 618 (Despite dismissing section 20A claims where plaintiffs did not trade on the same day, "find[ing] that two or three days, certainly less than a week, constitute[s] a reasonable period to measure the contemporaneity…."); *accord In re Enron Corp. Sec., Deriv. & ERISA Litig.*, No. H-01-3624, 2016 WL 4095973, at *38 (S.D. Tex. Aug. 2, 2016), *aff'd*, 725 F. App'x 278 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 199 (2018).

their fraud and negligent misrepresentation claims do not need to satisfy the heightened PSLRA pleading requirements, and even if they do, they satisfy that standard. ECF No. 47 at 28-29. Plaintiffs also contend that their negligent misrepresentation claims need only satisfy Rule 8 because these claims are based only on a subset of allegations in their complaint. *Id*. at 29.

To the extent Plaintiffs stated a claim under section 10(b) satisfying the PSLRA's heightened pleading standards, Defendants' motion to dismiss Plaintiffs' fraud and negligent representation claims should be denied as to the same alleged misstatements in paragraphs 90-94, 104-08, 111-16, 122, and 126-27 in the complaint. *See RYH Prop., LLC v. West*, No. 508-CV-172, 5:09-CV-29, 2009 WL 10676645, at *13 (E.D. Tex. Aug. 3, 2009) (denying defendants' motions to dismiss common law fraud claim where plaintiffs adequately pleaded federal securities fraud claims); *Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 364-65 (D. Conn. 2013) (denying defendants' motion to dismiss common law fraud and negligent misrepresentation claims where plaintiffs adequately pleaded federal securities fraud claims).

## A. Plaintiffs' Fraud Claims.

Regarding the remainder of Plaintiffs' common law fraud claims, Plaintiffs do not dispute that these must satisfy the particularity requirement of Rule 9(b), although they contend there need not be a "strong inference" of scienter because

state of mind can "be alleged generally."[44] ECF No. 47 at 28-29. While the standard for scienter may be slightly more relaxed under Rule 9(b) than under the PSLRA, Plaintiffs must still plead with particularity why the alleged misstatements are false under Rule 9(b).[45] To the extent Plaintiffs failed to plead why the alleged misstatements in paragraphs 90, 95-97, 99-103, 109, 110, 119, 121-25, 143-52, and 174 in the complaint were false under the PSLRA, they likewise fail to plead why the same statements were false under Rule 9(b).

### B. Plaintiffs' Negligent Misrepresentation Claims.

Ordinarily, negligent misrepresentation claims are not subject to Rule 9(b). *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668 (5th Cir. 2004). But Defendants argue that Rule 9(b) applies to "claims for negligent

---

[44] *See Flaherty v. Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) (although "common law fraud claims are not subject to the heightened 'strong inference' of scienter standard imposed by the PSLRA, … [they] are still subject to the pleading standard of Rule 9(b)."), *cert. denied*, 558 U.S. 873 (2009); *see also* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

[45] *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 561 (D. Conn. 2016) ("In order to satisfy Rule 9(b)'s particularity requirement with regard to fraud claims, the complaint must: '… (4) explain why the statements were fraudulent.'"); *see also Omni USA, Inc. v. Parker-Hannifin Corp.*, No. H-10-4728, 2012 WL 1038642, at *3 (S.D. Tex. Mar. 27, 2012) ("To plead fraud under Texas law, a plaintiff must allege (1) the defendant made a misrepresentation to the plaintiff; (2) the representation was material; (3) the representation was false….") (quoting *Shandong Yinguang Chem. Indust. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010)); *Simms v. Seaman*, 308 Conn. 523, 548, 69 A.3d 880 (2013) (Under Connecticut law, "[t]he essential elements of an action in common law fraud … are that: (1) a false representation was made as a statement of fact….") (quoting *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142, 2 A.3d 859 (2010)).

misrepresentations where the factual allegations underlying it and a fraud claim are the same." ECF No. 39 at 29; *Omni*, 2012 WL 1038642, at *2 (citing *Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003)) (collecting cases).[46] Plaintiffs argue that their negligent misrepresentation claims are based on different facts from their fraud claims, pointing to language in their complaint that for their negligent misrepresentation claims, they "incorporate each and every allegation contained above as if fully set forth herein, except all allegations concerning intentional reckless conduct, or that sound in fraud." ECF No. 3 at ¶¶ 251, 269.

While the Court doubts that such boilerplate language is sufficient to show that different facts form the basis of Plaintiffs' negligent misrepresentation claims, *Am. Realty Trust, Inc. v. Travelers Cas. & Sur. Co. of Am.* interpreted relevant Fifth Circuit law to mean instead that negligent misrepresentation claims

> do not become subject to heightened pleading simply because they are based on the same set of operative facts as corresponding fraud claims. Rather, Rule 9(b) operates to require dismissal of a negligent misrepresentation claim only when (1) a plaintiff waives arguments to the contrary or (2) the inadequate fraud claim is so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the fraud claim while leaving behind a viable negligent misrepresentation claim.

362 F. Supp. 2d 744, 749 (N.D. Tex. 2005). The court held that,

> in determining whether a negligent misrepresentation claim is subject to dismissal along with an impermissibly general fraud claim, the question is

---

[46] *Accord Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 737 (N.D. Tex. 2008) (granting motion to dismiss negligent misrepresentation claim based on the same operative facts as fraud claim).

whether … the Court [can] describe a simple redaction that removes allegations of fraud from the complaint, but leaves the plaintiff's valid and intelligible negligent misrepresentation claim intact…. Conversely, when it would be necessary to engage in line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of negligent misrepresentation, several factors counsel in favor of dismissal. … [I]f it is unclear which allegations pertain to the fraud claim as opposed to the negligent misrepresentation claim, the court risks interpreting the complaint in a manner inconsistent with the intent of the plaintiff. Finally, a court that endeavors to separate intertwined fraud and negligence claims takes upon itself a burden that is better placed upon the party responsible for the defective pleading. Rather than "sift through allegations of fraud in search of some lesser included claim," or "rewrite … a deficient complaint," the court should dismiss without prejudice.

*Id*. at 752. This Court's review of Defendants' cited cases and the Fifth Circuit cases they rely on suggest that Fifth Circuit precedent on this matter does not go quite as far as Defendants urge—that Rule 9(b) categorically applies to negligent misrepresentation claims whenever they are based on the same facts underlying fraud claims. *See Hamilton Lane*, 115 F. App'x at 668 (reversing dismissal of negligent misrepresentation claim under Rule 9(b)).

Nevertheless, the Court is unable to effectively distinguish between Plaintiffs' fraud and negligent misrepresentation claims without "engag[ing] in a line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of misrepresentation…." because the negligent misrepresentation claims appear to be based on the same alleged misstatements and Plaintiffs' allegations for why those statements are false. *Am. Realty Trust, Inc.*, 362 F. Supp. 2d at 752.

In addition, even if Plaintiffs need only satisfy Rule 8, to state a claim for

negligent misrepresentation under either Texas or Connecticut law, Plaintiffs must still allege that a false statement was made.[47] For the same reasons Plaintiffs failed to allege why the statements in paragraphs 90, 95-97, 99-103, 109, 110, 119, 121-25, 143-52, and 174 were actionable for their section 10(b) claim, Plaintiffs likewise failed to allege those same statements were false even under the lower Rule 8 pleading standard. Thus, Defendants' motion to dismiss Plaintiffs' state law claims should be granted in part and denied in part to the same extent as Plaintiffs' section 10(b) claim.

## VII.
## LEAVE TO AMEND

Plaintiffs request that if the Court grants Defendants' motion, they be granted leave to amend. ECF No. 47 at 32. "When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice" unless it is clear the defects are incurable. *Freuler v. Parker*, 803 F. Supp. 2d 630, 635 (S.D. Tex. 2011) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,

---

[47] *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 560 (D. Conn. 2016) ("To plead a claim for negligent misrepresentation under Connecticut law, a plaintiff must allege (1) that the defendant made a misrepresentation of fact….") (citations omitted); *City of Houston Tex. v. Towers Watson & Co.*, No. 4:14-CV-2213, 2015 WL 5604059, at *2 (S.D. Tex. Sept. 23, 2015) (Under Texas law, "[t]o state a claim for negligent misrepresentation, a plaintiff must allege: … (2) the defendant supplies 'false information' ….") (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

313 F.3d 305, 329 (5th Cir. 2002)), *aff'd*, 517 F. App'x 227 (5th Cir. 2013). Courts have discretion to grant leave to amend and may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id*. (quoting *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)).

While Defendants did not address Plaintiffs' request for leave to amend, they point out that Plaintiffs had access to hundreds of thousands of documents and deposition testimony from the Class Action before filing this action. ECF No. 39 at 8. Therefore, amendment might be futile. Plaintiffs also have not explained what additional facts they could plead to cure any deficiencies. ECF No. 47 at 32. But, based on the parties' minimal briefing on this issue, the Court cannot conclude that amendment would in fact be futile. The operative complaint is still the original complaint and Plaintiffs should be granted at least one opportunity to amend.

## VIII.
## CONCLUSION

The Court recommends that Defendants' motion to dismiss, ECF No. 39, should be **DENIED in part** and **GRANTED in part without prejudice** as follows:

1. Defendants' motion to dismiss Plaintiffs' claim for securities fraud under section 10(b) and Rule 10b-5 claim and corresponding state law claims

should be **denied** as to the alleged misstatements in paragraphs 90-94,[48] 104-08, 111-16, 122,[49] and 126-27 in the complaint.

2. Defendants' motion to dismiss Plaintiffs' claim for securities fraud under section 10(b) and Rule 10b-5 claim and corresponding state law claims should be **granted** as to the alleged misstatements in paragraphs 90,[50] 95-97, 99-103, 109, 110, 119, 121-25,[51] 143-52, and 174 in the complaint.

3. Defendants' motion to dismiss Plaintiffs' claim for control liability under section 20(a) should be **denied** as to Wright and Poppe and **granted** as to Taylor.

4. Defendants' motion to dismiss Plaintiffs' claim for insider trading under section 20A should be **denied**.

5. Defendant Taylor should be **dismissed**.

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). Failure to file timely objections will preclude review of factual findings or legal conclusions, except for plain error.** *Quinn v. Guerrero*, **863 F.3d 353, 358 (5th Cir. 2017).**

---

[48] This part of paragraph 90 should remain: "In February we … began underwriting applications with credit scores between 500 and 525."

[49] This part of paragraph 122 should remain: "….the Company made good progress in addressing the issues we experienced in the second quarter with our credit collection system."

[50] Only this part of paragraph 90 should be struck: "[T]he standard credit score is not a reliable predictor of credit performance at lower scores given our installment lending structure…."

[51] Only this part of paragraph 122 should be struck: "We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio. Delinquency should improve markedly over the next quarter."

Signed at Houston, Texas, on July 24, 2019.

_____
Dena Hanovice Palermo
United States Magistrate Judge